## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | **Case No. 24-cr-392 (TNM)** |
| v. | : | |
| | : | |
| DAVID M. VALENTINE, | : | |
| | : | |
| Defendant. | : | |

### UNITED STATES' FIRST OMNIBUS MOTION IN LIMINE

The United States respectfully submits its first omnibus brief arguing motions *in limine* because, at the time of this filing, trial must commence within 70 days of October 18, 2024, or no later than December 27, 2024. The government offers the authorities and analysis below to promote efficiency and reduce the need to argue objections mid-trial. For each motion herein, the United States asks that the Court grant the requested relief or, if the Court reserves ruling, to consider the below arguments when the relevant issues arise during trial.

### MOTIONS

It is well-established that a district court has the discretion to limit a criminal defendant's presentation of evidence and cross-examination of witnesses. *See Alford v. United States*, 282 U.S. 687 (1931) ("The extent of cross-examination [of a witness] with respect to an appropriate subject of inquiry is within the sound discretion of the trial court."); *United States v. Whitmore*, 359 F.3d 609, 615-16 (D.C. Cir. 2004) ("The district court . . . has considerable discretion to place reasonable limits on a criminal defendant's presentation of evidence and cross-examination of government witnesses."). A court has the discretion to prohibit cross-examination that goes beyond matters testified to on direct examination. Fed. R. Evid. 611(b). This is particularly so when the information at issue is of a sensitive nature. *See, e.g.*, *United States v. Balistreri*, 779 F.2d 1191, 1216-17 (7th Cir. 1985) (upholding district court's decision to prohibit cross-examination of agent

about sensitive information about which that agent did not testify on direct examination and which did not pertain to the charges in the case), *overruled on other grounds by Fowler v. Butts*, 829 F.3d 788 (7th Cir. 2016).

The Confrontation Clause only guarantees "an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985). Even evidence that may be relevant to an affirmative defense should be excluded until the defendant sufficiently establishes that defense through affirmative evidence presented during his own case-in-chief. *See United States v. Lin*, 101 F.3d 760, 768 (D.C. Cir. 1996) (acknowledging trial court has discretion to limit cross-examination on prejudicial matters without reasonable grounding in fact); *United States v. Sampol*, 636 F.2d 621, 663-64 (D.C. Cir. 1980) (holding that trial court properly limited cross-examination of alleged CIA murder scheme until defense put forth sufficient evidence of the affirmative defense in its case-in-chief). Preventing the defendants from exploring the topics identified above will not infringe their Confrontation Clause right because the exact positions of cameras, the camera map, and U.S. Secret Service protocols, implicate national security concerns, are of marginal probative value, and any probative value can be addressed without compromising the protective functions of government agencies.

## I.    *Motion in Limine to Limit Unnecessary Discussion of Security-Related Topics*

Certain topics that could arise at trial—namely the exact locations of USCP CCTV cameras and the protocols of the U.S. Secret Service (USSS)—have little to no probative value but would compromise significant security interests if needlessly disclosed to the public. The government does not intend to elicit any of the following topics in its case-in-chief and, therefore, cross-examination on such topics would be beyond the scope of direct and impermissible. Fed. R. Evid.

611(b). To the extent that the defendant seeks to argue that any of the following topics are relevant and within the scope of the government's examination, the government requests an order under Fed. R. Evid. 403 foreclosing unnecessary cross-examination on these topics.

### A.   Exact Locations of USCP Cameras

The government seeks an order limiting the defense from probing, during cross-examination, the exact locations of Capitol Police surveillance cameras or from using previously disclosed maps, which show each camera's physical location, as an exhibit at trial. The government produced such information to defendants in discovery pursuant to the Highly Sensitive designation of the Protective Order. *See* ECF No. 17. The defendant will be able to make use of this information in order to identify evidence and prepare for trial; however, none of the information serves to illuminate any fact of consequence that is before the factfinder.

This lack of relevance must be balanced against the national security implications at stake here. The U.S. Capitol Police's surveillance system serves an important and ongoing function in protecting Congress, and therefore, national security. Furthermore, the government represents that the maps that show the physical location of cameras have been designated as "Security Information" under 2 U.S.C. § 1979, which generally requires approval of the Capitol Police Board before they may be released.

Evidence about the exact locations of cameras, and the maps used to locate the cameras, should be excluded in light of the ongoing security needs of Congress. Absent some concrete and specific defense need to probe the camera's location, there is nothing to be gained from such questioning. A general description, and the footage from the camera itself, will make clear what the camera recorded and what it did not. Additionally, presenting the map of all Capitol Police cameras would risk compromising these security concerns for no additional probative value: the

map contains numerous cameras installed in parts of the Capitol that the defendant did not visit on January 6, 2021.

Here, the video footage itself reveals the *general* location and angle of the camera's positioning. Additional details as to the precise location of the cameras are not relevant to the fact-finding mission. Even assuming the evidence that the government seeks to exclude is marginally relevant, such relevance is substantially outweighed by the danger to national security. The Supreme Court has recognized that trial courts' balancing should account for concerns extrinsic to the litigation, such as "witness' safety." *Olden v. Kentucky*, 488 U.S. 227, 232 (1988). Accordingly, courts have properly balanced the sensitivity of national security-related information against the probative value of such information to the case, excluding the evidence where its relevance is slight. *See, e.g.*, *United States v. Marshall*, 544 F. Supp. 3d 1032, 1042 (D. Mont. 2021); *United States v. Mohammed*, 410 F. Supp. 2d 913, 918 (S.D. Cal. 2005); *cf. United States v. Sarkissian*, 841 F.2d 959, 965 (9th Cir. 1988) (endorsing balancing test in context of Classified Information Procedures Act). If a map that revealed the location of all Capitol cameras were introduced in this trial, or in any trial, it would become available to the general public and foreign adversaries. Immediately, anyone could learn about the Capitol Police's camera coverage as of January 6, 2021, and—importantly—could learn about the parts of the Capitol where cameras were not installed. Broader presentation of evidence about camera locations could compromise national security without adding any appreciable benefit to the determination of the truth, or the veracity or bias of witnesses. *Id.*

## B. *Secret Service Protocols*

To meet its burden of proof at trial, the government anticipates it will call a witness from the United States Secret Service to testify that at the time of the Capitol breach, Secret Service agents were on duty to protect Vice President Mike Pence and his two immediate family members,

all of whom were present at the Capitol.[1] The witness will further testify about the Capitol breach's effect on the Secret Service's protection of Vice President Pence and his family members.

The very nature of the Secret Service's role in protecting the Vice President and his family implicates sensitive information related to that agency's ability to protect high-ranking members of the Executive branch and, by extension, national security. Thus, the government seeks an order limiting the cross-examination of the Secret Service witnesses to questioning about the federally protected function performed by the Secret Service as testified to on direct exam, namely, protecting the Vice President and his family. The government further requests that such order preclude cross-examination that would elicit information that does not directly relate to whether the Secret Service was performing that function at the Capitol on January 6, 2021. Specifically, cross-examination should not be permitted to extend to (1) Secret Service protocols related to the locations where protectees or their motorcades are taken at the Capitol or other government buildings when emergencies occur, and (2) details about the nature of Secret Service protective details, such as the number and type of agents the Secret Service assigns to protectees. These topics have no relevance to any issue at controversy, and even if they did, any relevance would be substantially outweighed by the danger of prejudicing the government's legitimate interest in the safety of senior government officials. *See* Fed. R. Evid. 403.

The government intends to offer the testimony that pursuant to authority under 18 U.S.C. § 3056(a)(1), on January 6, 2021, Secret Service agents were at the Capitol to protect Vice President Mike Pence and two members of his immediate family. A Secret Service official is further expected to explain how the events at the Capitol on that date affected the Secret Service's ability to protect Vice President Pence and his family. This testimony will both explain—in part—

---

[1] This is assuming no stipulations are reached by the parties on this topic.

the bases for enhanced security controls at the Capitol on January 6 as well as establish an element of the charge at Count One, *i.e.*, that the civil disorder at the Capitol on January 6 interfered with a federally protected function.

Cross-examination of Secret Service witnesses about extraneous matters beyond the scope of direct examination should be excluded as irrelevant or unduly prejudicial. Specifically, the Secret Service's general protocols about relocation for safety should be excluded as irrelevant because such evidence does not tend to make a fact of consequence more or less probable. Fed. R. Evid. 401 (defining relevant evidence). Similarly, evidence of the nature of Secret Service protective details is not relevant in this case. The disorder on January 6 interfered with the Secret Service's duties to protectees in this case insofar as they were required to take evasive action because of the mob. The number or type of assigned agents on a protective detail is simply not relevant and could not alter the probability that there was interference with the Secret Service. None of the other elements to be proven, or available defenses, implicates further testimony from the Secret Service.

Even assuming the evidence to be excluded is marginally relevant, such relevance is substantially outweighed by the danger of confusion of the issues, mini-trials, undue delay, and waste of time. Broader cross-examination of Secret Service witnesses could compromise national security without adding any appreciable benefit to the determination of the truth, or the veracity or bias of witnesses. *Id.*[2]

---

[2] If the defense believes that it is necessary to present evidence or cross-examine witnesses about the exact locations of USCP cameras or USSS procedures, the government requests that the Court conduct a hearing *in camera* to resolve the issue. Courts have found that *in camera* proceedings are appropriate in circumstances where security concerns like these are present. *See United States v. Nixon*, 418 U.S. 683, 714 (1974) (affirming district court's order for in camera inspection of subpoenaed presidential materials); *United States v. Kampiles*, 609 F.2d 1233, 1248 (7th Cir. 1979) ("It is settled that *in camera* . . . proceedings to evaluate bona fide Government claims regarding

## II.     *Motion in Limine to Preclude Improper Defense Arguments*

### A.  *Entrapment by Estoppel or a Public Authority Defense*

The Court should prohibit the defendant from making arguments, introducing irrelevant evidence, or suggesting that former President Donald J. Trump or any other officials gave him permission to attack the U.S. Capitol in what are commonly known as "entrapment-by-estoppel" or "public authority" defenses. The defendant cannot point to such permission, and, even if he could, it would not constitute legal permission for his particular conduct.

As courts in this district have explained, the entrapment-by-estoppel and public authority defenses are closely related and derive from a constitutional prohibition against "convicting a citizen for exercising a privilege which the State had clearly told him was available to him." *United States v. Sheppard*, No. 21-cr-203, 2022 WL 17978837, at *7 (D.D.C. Dec. 28, 2022) (J. Bates) (quoting *Cox v. Louisiana*, 379 U.S. 559, 571 (1965)). Both defenses are narrow ones, however, and a defendant may succeed on them only if they meet rigorous evidentiary requirements. *See United States v. Alvarado*, 808 F.3d 474, 484-85 (11th Cir. 2015) ("The public authority defense is narrowly defined, however, and a defendant will not be allowed to assert the defense, or to demand that the jury be instructed on it, unless he meets certain evidentiary prerequisites."); *United States v. Baker*, 438 F.3d 749, 755 (7th Cir. 2006) ("The [entrapment-by-estoppel] defense is a narrow one."). To succeed on an entrapment-by-estoppel claim, a defendant must prove:

---

national security information are proper."); *In re Taylor*, 567 F.2d 1183, 1188 (2d Cir. 1977) (finding that *in camera* proceedings "serve to resolve, without disclosure, the conflict between the threatened deprivation of a party's constitutional rights and the Government's claim of privilege based on the needs of public security"); *United States v. Brown*, 539 F.2d 467, 470 (5th Cir. 1976) (per curiam) (same). At any such hearing, the defendant should be required to make a specific proffer of some relevant purpose that is not substantially outweighed by the prejudice that disclosure would inflict on the government's security interests. *Cf. United States v. Willie*, 941 F.2d 1384, 1393 (10th Cir. 1991) (explaining that a "proffer of great specificity" was necessary to support admission of testimony that could have proper or improper purposes).

(1) that a government agent actively misled him about the state of the law defining the offense;

(2) that the government agent was responsible for interpreting, administering, or enforcing the law defining the offense;

(3) that the defendant actually relied on the agent's misleading pronouncement in committing the offense; and

(4) that the defendant's reliance was reasonable in light of the identity of the agent, the point of law misrepresented, and the substance of the misrepresentation.

*United States v. Chrestman*, 525 F. Supp. 3d 14, 31 (D.D.C. 2021) (C.J. Howell) (quoting *Cox*, 906 F.3d at 1191). This district has articulated a similar four-part analysis for the public authority defense:

[A]n individual (1) reasonably, on the basis of an objective standard, (2) relies on a (3) conclusion or statement of law (4) issued by an official charged with interpretation, administration, and/or enforcement responsibilities in the relevant legal field.

*Sheppard*, 2022 WL 17978837 at *8 (quoting *United States v. Barker*, 546 F.2d 940, 955 (D.C. Cir. 1976). Common between these standards is, among other things, that a government official must offer a "state" or "statement" of the law.

The defendant has not, and cannot, argue that, in urging supporters towards the Capitol, then-President Trump made a "statement" of law. By now, several courts in this district have considered various defendants' arguments that the former President's words immunized their actions on January 6. To the government's knowledge, all these arguments have failed. *See, e.g.*, *Sheppard*, 2022 WL 17978837 at *9 (prohibiting defendant from seeking discovery or presenting evidence at trial on entrapment-by-estoppel or public authority defenses); Order at 2, ECF No. 39, *United States v. Thompson*, No. 21-cr-161 (D.D.C. Mar. 23, 2022) (J. Walton) (excluding evidence of former President Trump's statements for all purposes as unduly prejudicial under Fed. R. Evid. 403); *United States v. Grider*, No. 21-cr-022, 2022 WL 3030974, at *4 (D.D.C. Aug. 1, 2022) (J.

Kollar-Kotelly) (declining to instruct jury on defense of entrapment by estoppel); *Chrestman*, 525 F.Supp.3d at 33 (noting that an entrapment-by-estoppel defense is "highly unlikely" to succeed and declining to consider it as weighing in favor of granting pre-trial release).

Various defendants' efforts to assert an entrapment-by-estoppel defense have uniformly failed, given that, as Judge Bates observed, the defense is available "only when the official's statements or conduct state or clearly imply that the defendant's actions are lawful." *Sheppard*, 2022 WL 17978837 at *9. The key challenge for defendants is that, as other courts have observed, "President Trump neither stated nor implied that entering the restricted area of the Capitol grounds and the Capitol building or impeding the certification of the electoral vote was lawful." *Id.* Rather:

> [Trump's] speech simply suggests that it would be an act of "boldness" to "stop the steal." Thus, allowing [the defendant's] reliance on these words would be an instance of allowing "following orders, without more, [to] transform an illegal act into a legal one"—something the D.C. Circuit has unequivocally declined to do.

*Id.* (quoting *United States v. North*, 910 F.2d 843, 879 (D.C. Cir. 1990) (per curiam), *opinion withdrawn and superseded in part on reh'g*, 920 F.2d 940 (D.C. Cir. 1990)).

Similarly, Judge Kollar-Kotelly, in considering an entrapment-by-estoppel argument, noted that "former President Trump's statements did not in any way address the legality of the actions he urged his supporters to take. He did not, for example, assure them that marching along Pennsylvania was 'lawful' or that occupying Capitol grounds was 'permissible.'" *Grider*, 2022 WL 3030974 at *3. In short, then-President Trump did not mislead the Defendants in this case about the state of the law, because Trump did not make any statement about the law at all. *Id.* at 2.

Even if then-President Trump *had* made a statement about the law, allowing those statements to immunize the defendant's conduct here would raise serious constitutional concerns. As Judge Howell observed about another entrapment-by-estoppel defense by a similarly situated

defendant, "No American President holds the power to sanction unlawful actions because this would make a farce of the rule of law." *Chrestman*, 525 F.Supp.3d at 32:

> [N]o President may unilaterally abrogate criminal laws duly enacted by Congress as they apply to a subgroup of his most vehement supporters. Accepting that premise, even for the limited purpose of immunizing defendant and others similarly situated from criminal liability, would require this Court to accept that the President may prospectively shield whomever he pleases from prosecution simply by advising them that their conduct is lawful, in derefliction of his constitutional obligation to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. That proposition is beyond the constitutional pale, and thus beyond the lawful powers of the President.
>
> Even more troubling than the implication that the President can waive statutory law is the suggestion that the President can sanction conduct that strikes at the very heart of the Constitution and thus immunize from criminal liability those who seek to destabilize or even topple the constitutional order. In addition to his obligation to faithfully execute the laws of the United States, including the Constitution, the President takes an oath to "preserve, protect and defend the Constitution." U.S. Const. art. II, § 1, cl. 8. He cannot, in keeping with his constitutional function and his responsibilities under Article II, lawfully permit actions that directly undermine the Constitution.

*Id.* at 32–33 (D.D.C. 2021). In other words, to allow an entrapment-by-estoppel or public authority defense based on the President's false statements of law would implicate both the Take Care clause and the presidential oath of office, and, more fundamentally, disrupt the nature of the rule of law in America.

Nor can the defendant point to statements or permission from other government actors. Although *Chrestman* involved an argument that former President Trump gave the defendant permission to enter the Capitol grounds, the reasoning in *Chrestman* applies equally to any argument that other officials or law enforcement officers gave permission to the defendant to do the same. Just as a President cannot unilaterally repeal laws, no other officials or members of law enforcement could use their authority to allow individuals to enter the Capitol building or Capitol grounds during a violent riot. As Judge Howell observed, "the logic in *Chrestman* that a U.S. President cannot unilaterally abrogate statutory law applies with equal force to government actors

in less powerful offices, such as law enforcement officers protecting the U.S. Capitol Building." Memorandum and Order, *United States v. Williams*, No. 21-cr-377, at *2 (D.D.C. June 8, 2022).

Even if the defendant could establish that an official or officer gave him permission to do what he did on January 6, his reliance on any such statement would not be reasonable considering the "obvious police barricades, police lines, and police orders restricting entry at the Capitol." *Chrestman*, 525 F.Supp.3d at 32. Moreover, the defendant's actions here contradict any argument that he relied on any such statement by law enforcement when he decided to unlawfully enter the Capitol grounds, as video evidence shows that the defendant posted video of himself, inside the Capitol, stating that he was "storming" the building, and further that he was present and observed a violent confrontation between a rioter and police officers at the Speaker's Lobby, shortly before being directly ordered to leave. Accordingly, the defendant should be prohibited from arguing— speciously and contrary to law—that his conduct was legal because someone allegedly told him it was permitted.[3]

### B. The First Amendment Defense

The Court should preclude the defendant from arguing or eliciting evidence that on January 6, he enjoyed a First Amendment right to protest inside the restricted area around the Capitol. At trial, the government will show that the Capitol grounds and building were restricted on January 6 within the meaning of 18 U.S.C. § 1752(c)(1)(B) (defining a "restricted building or grounds" as "any posted, cordoned off, or otherwise restricted area . . . of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting"). When assessing restrictions that the government seeks to place on the use of its own property, the

---

[3] Regardless, "entrapment by estoppel is a defense rather than an evidentiary objection and, accordingly, should have been raised prior to trial." *United States v. Colon Ledee*, 967 F. Supp. 2d 516, 520 (D.P.R. 2013). Having raised no such defense in pre-trial filings, and for the reasons discussed above, the Defendant should be precluded from raising these defenses at trial.

Supreme Court has been consistent in holding that "the First Amendment does not guarantee access to property simply because it is owned or controlled by the government." *United States Postal Serv. v. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114, 129 (1981). The government can—and on January 6, did—restrict an area that is a traditional public forum for legitimate government ends. Courts in this district have repeatedly affirmed that the government may close a public forum in similar circumstances. *See, e.g.*, *Mahoney v. United States Marshals Service*, 454 F. Supp. 2d 21, 32-33 (D.D.C. 2006) (U.S. Marshals Service did not violate the First Amendment by restricting access to a sidewalk in front of St. Matthew's Cathedral for Red Mass, even though the sidewalk was a traditional public forum). Unsurprisingly, other courts have similarly upheld temporary closures of traditional public forums for safety reasons. *See Menotti v. City of Seattle*, 409 F.3d 1113, 1129-30 (9th Cir. 2005) (finding that an emergency order closing a core area of downtown Seattle to protests during World Trade Organization conference was constitutional in part because its purpose was to maintain and restore civic order); *Marcavage v. City of New York*, 489 F.3d 98, 105 (2d Cir. 2012) ("[T]here can be no doubting the substantial government interest in the maintenance of security at political conventions"); *Citizens for Peace in Space v. City of Colorado Springs*, 477 F.3d 1212, 1222 (10th Cir. 2007) ("In this case, there can be no doubt that the City's interest in providing security to a gathering of defense officials is of the highest order"); *Bl(a)ck Tea Society v. City of Boston*, 378 F.3d 8, 11 (1st Cir. 2004) (upholding a street-closure plan around the Democratic National Convention that made it nearly impossible for groups wishing to demonstrate to do so within sight and sound of the delegates).

On January 6, the USCP and the Secret Service coordinated to establish a restricted perimeter around the Capitol building that encompassed a portion of the Capitol grounds but, notably, left other areas of the U.S. Capitol grounds open and available for expressive conduct.

Although the defendant may attempt to suggest otherwise, no member of the public, including the defendant, had a First Amendment right to engage in protest or speech within that restricted area. The Court should preclude the defendant from eliciting testimony to the contrary or arguing that he was engaged in protected speech or pursuing his "right" to protest when he was on the Capitol grounds.

### III.   Motion in Limine to Preclude the Defendant from Introducing Evidence of his own Good Conduct or Comparing his Relative Culpability to Other Rioters

The Court should preclude any argument that seeks to contrast the defendant's criminal actions on January 6, 2021, with the conduct of other rioters, and should also preclude the presentation of evidence of any allegedly helpful acts offered to negate the criminal conduct for which he is charged. *See United States v. Camejo*, 929 F.2d 610, 612-13 (11th Cir. 1991) (a witness's proffered testimony that a defendant declined to participate in a separate, contemporaneous narcotics conspiracy was an inadmissible "attempt to portray [the defendant] as a good character through the use of prior 'good acts'"). Such evidence would not be probative of whether the defendant is guilty of the offenses with which he is charged.

Evidence of past "good acts" by a defendant is generally not probative unless a defendant is alleged to have always or continuously committed bad acts or engaged in ceaseless criminal conduct. *United States v. Damti*, 109 Fed. Appx. 454, 455-56 (2nd Cir. 2004) (citations omitted). Ceaseless conduct occurs when it is alleged that all the defendant's actions were illegal. *Id*. When that is not alleged and the prosecution can point to specific criminal acts, then evidence of good acts is not probative of the issue of guilt at trial. *Id*. Using specific instances of good acts "to prove lack of intent . . . is not only disfavored, it is not permitted under Rule 405(b)." *United States v. Marrero*, 904 F.2d 251, 259–60 (5th Cir. 1990) (affirming decision to exclude evidence that the defendant "provided more services to some clients than they were actually billed for and

that sometimes she rendered services free of charge," which the defendant sought to introduce to show that she did not intend to improperly bill a government agency for medical services).

Even if probative, however, introducing evidence about the defendant's irrelevant conduct risks confusing the issues by inviting the factfinder to weigh the defendant's culpability relative to other rioters, and ought to be excluded. *See United States v. King*, 254 F.3d 1098, 1100 (D.C. Cir. 2001) ("Evidence that is admissible under Rule 404 may nonetheless be excluded under Rule 403 'if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.'"). Any alleged specific good acts by the defendant are not connected to the issues of this case. Introducing evidence of such acts carries an unnecessary risk of distracting the factfinder with improper arguments based not on whether the evidence shows that the defendant committed the charged crimes, but instead on whether the defendant allegedly performed some unrelated good deed.

### IV.  *Motion in Limine to Preclude Improper Defense Arguments Pertaining to the Actions of Other Rioters or their Charges and Case Dispositions*

The government requests that the Court exclude any evidence or argument pertaining to charges or dispositions in other January 6 cases. Such evidence or argument, which would implicate procedural events occurring after January 6, has no bearing on the proof of the defendant's alleged criminal conduct that day. In addition, any such evidence or argument would divert attention to other defendants and criminal allegations rather than the conduct of this defendant. Given this would confuse the issues at trial, be a misleading argument, cause undue delay, and waste time, Rule 403 independently supports exclusion. At most, "disparate charging decisions in similar circumstances may be relevant at sentencing." *See United States v. Griffin*, 549 F. Supp. 3d 49, 59 (D.D.C. 2021). As the D.C. Circuit recognized in *Washington*, 705 F.2d

489, it has no bearing on the factfinder's determination of a defendant's guilt or innocence on the underlying charges.

## **CONCLUSION**

For the reasons described above, the United States respectfully requests that this Court grant the government's first omnibus motion *in limine* in its entirety.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:     */s/ Carlos A. Valdivia*
Carlos Valdivia
D.C. Bar No. 1019242
Assistant United States Attorney
601 D St., NW
Washington, DC 20579
Carlos.Valdivia@usdoj.gov
202-252-7508